1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

THELEN REID & PRIEST LLP,                 No C 06-2071 VRW

       Plaintiff,
       Counterdefendant,              ORDER
       and Counter-
       Counterclaimant,

       v

FRANÇOIS MARLAND,

       Defendant,
       Counterclaimant,
       and Counter-
       Counterdefendant.
_____/


       Defendant Francois Marland ("Marland") seeks an order
directing plaintiff Thelen Reid & Priest LLP ("Thelen") to produce
64 documents for which Thelen has asserted attorney-client and work
product privileges.  Doc #66 at 2, Doc #93.  Marland also seeks an
order directing Thelen to identify, on its privilege log, certain

United States District Court
For the Northern District of California

1   documents from after February 2005 that Thelen also claims are
2   privileged.  Doc #99 at 8.

3       Thelen seeks an order compelling production of an August
4   27, 2002 letter to Marland from his European counsel that Marland
5   claims was inadvertently produced.  Doc #106-1.  Marland seeks
6   sanctions against Thelen, including disqualification of Thelen's
7   counsel, Keker & Van Nest ("Keker"), for alleged misconduct
8   relating to Marland's inadvertently produced documents.

9

10                                  I

11      This issue arises out a contract dispute between Thelen
12  and Marland.  Thelen is a California limited liability partnership
13  and a law firm.  Doc #11 at 1.  Marland is a citizen of France, a
14  French attorney and currently a resident of Switzerland.  Id.

15

16                                  A

17      In 1997, Marland approached the New York law firm of Reid
18  & Priest, claiming to possess information about an undisclosed
19  fronting agreement, or *contrat de portage*, through which Crédit
20  Lyonnais, a French bank, had illegally acquired the insurance
21  assets of Executive Life Insurance Company (ELIC), an insolvent
22  California insurance company, at an auction conducted by the
23  California Department of Insurance (CDOI) in 1991.  Doc #78 at 13.
24  Marland wanted to know whether he could obtain a financial benefit
25  by divulging information about a July 1991 *contrat de portage* he
26  claimed to have in his possession to parties in the United States.
27  Id.  After Reid & Priest merged with Thelen, Marrin, Johnson &
28  Bridges in 1998, Marland met with Gary Fontana, a Thelen partner in

**United States District Court**
For the Northern District of California

San Francisco who had previously worked for other clients on ELIC proceedings. Id.

Between October 1998 and February 1999, Thelen partners met with representatives of CDOI and attempted to negotiate an agreement between CDOI and Marland. Id at 14. Ultimately, CDOI failed to offer acceptable compensation. Id at 15. As a result, Thelen recommended that Marland initiate his own *qui tam* lawsuit on behalf of the state of California and CDOI. Id. In February 1999, Thelen and Marland signed an attorney-client agreement, providing that Thelen would file a *qui tam* lawsuit against Crédit Lyonnais and advise or assist CDOI and/or the California Attorney General in connection with the lawsuit, in exchange for a percentage of any recovery that Marland received. Id. Thelen helped Marland incorporate an entity called RoNo LLC to protect his anonymity through the process. Doc #72 at 2. Marland alleges that Thelen hurried him to accept an unconsionable fee agreement and that Fontana signed the agreement without obtaining the necessary firm approvals. Id at 33.

On February 18, 1999, Thelen filed the *qui tam* lawsuit in San Francisco superior court. Doc #78 at 15. That same day, CDOI independently filed a separate complaint in Los Angeles County superior court, raising almost identical claims against many of the same defendants. Id.

Subsequently, in May 1999, CDOI asked Thelen to represent CDOI in its lawsuit. Id. CDOI agreed to allow Marland and Marland's European counsel to share a portion of Thelen's legal fees if it succeeded in the litigation. Id at 16. Thelen claims that it informed Marland and Marland's European counsel of CDOI's

3

United States District Court

For the Northern District of California

proposal and of the potential conflicts between CDOI's lawsuit and Marland's own *qui tam* lawsuit.  Doc #98 at 3-4.  Marland contends that Thelen never disclosed its potential conflicts from the dual representation.  Doc #72 at 34.

Thelen alleges that Marland's claim to possess a copy of the July 1991 *contrat de portage* was critical to CDOI's decision to retain Thelen and CDOI's consent to Thelen's sharing fees with Marland.  Doc #78 at 16.  Marland contends that Thelen never told him he had an obligation to preserve or produce evidence that might have identified him as the whistleblower.  Doc #72 at 33.

On May 25, 1999, Thelen and CDOI signed a formal attorney-client agreement, under which CDOI agreed to pay Thelen a percentage of any recovery it received.  Doc #78 at 16.  On June 2, 1999, Thelen and Marland executed a written amendment to the February 1999 agreement under which Marland agreed that Thelen would take all reasonable steps to dismiss the *qui tam* action.  Id. On June 3, 1999, Thelen, Marland and Marland's European counsel entered into an agreement under which Thelen agreed to share any legal fees it received from CDOI with Marland and European counsel. Id.

By July 2001, the Attorney General completed his investigation of the *qui tam* action and elected to intervene in the action.  Doc #98 at 4.  The Attorney General objected to Thelen's continued representation of RoNo as the *qui tam* relator.  Id. Thelen withdrew from representing RoNo in the *qui tam* action and assisted Marland in retaining other counsel.  Id.  Thelen continued to serve as general counsel to RoNo.  Id.

\\

4

**United States District Court**
For the Northern District of California

1   Thelen alleges that by December 2001, CDOI's lawsuit had
2   become much more costly than the parties had anticipated.  Doc #78
3   at 18.  Thelen wanted to ask CDOI for a non-recourse advance to the
4   firm.  Id.  Because the June 1999 agreement required Thelen to pay
5   to Marland a percentage of any fees received from CDOI, Thelen
6   approached Marland to negotiate a restructuring of their fee
7   sharing relationship.  Id.

8   In June or July of 2002, Thelen requested that Marland
9   produce the July 1991 *portage*.  Id.  Marland refused to produce the
10  document and said for the first time that he had destroyed it.  Id.
11  On July 8, 2002, pursuant to the terms of the February 1999
12  agreement, Thelen gave Marland 30 days' written notice of its
13  decision to withdraw from representing him.  Id.  Thelen extended
14  the notice period once, to August 30, 2002.  Doc #98 at 5.  Thelen
15  claims that "[a]fter that date," Thelen's attorney-client
16  relationship with Marland ended.  Id.  Presumably, Thelen means
17  that its attorney-client relationship with Marland ended
18  <u>immediately</u> after August 30, 2002 (i e, September 1, 2002).

19  Thelen contends that Marland's actions constituted a
20  material breach of the June 1999 agreement and provided grounds for
21  rescission, excuse of performance or both.  Doc #98 at 6.  Thelen
22  considered any future performance on its part under the June 1999
23  agreement excused by Marland's breach.  Id.

24  On December 19, 2002, Thelen, Marland, and Marland's
25  European counsel entered a new agreement which replaced "any and
26  all other agreements among them."  Doc #78 at 19.  Under the terms
27  of the December 2002 agreement, Thelen agreed to pay Marland and
28  European counsel 35% of the fees paid to Thelen by CDOI, in

United States District Court
For the Northern District of California

1  exchange for the parties' mutual release and waiver of all claims.
2  Id at 19-20.

3         Marland alleges that Thelen used the litigation costs and
4  the *portage* as a pretense to get Marland to reduce his share of the
5  recoveries from the litigation.  Doc #72 at 37.  Marland alleges he
6  was coerced into signing the December 2002 agreement through
7  intentional misrepresentations and inadequate respresentation of
8  his interests by Thelen.  Id at 37-39.

9         Thelen claims that, in reliance on the December 2002
10  agreement, it continued to expend time and resources on the
11  litigation and ultimately succeeded in obtaining nearly $1 billion
12  in settlements and judgments.  Doc #78 at 20.  Thelen has paid, and
13  Marland has accepted, over $19 million pursuant to the terms of the
14  December 2002 agreement.  Id.

15         On February 13, 2006, Marland commenced an arbitration
16  proceeding against Thelen in New York City, asserting that the
17  December 2002 agreement is not fair and is unenforceable and that
18  the release and waiver provisions of that agreement are void.  Id.
19  Marland alleges that the December 2002 agreement never went into
20  effect and that the February 1999 and June 1999 agreements remain
21  valid and binding.  Doc #72.  Marland claims that it had an
22  attorney-client relationship with Thelen until February 4, 2005.
23  Doc #102, Ex A.

24         Thelen initiated this action against Marland, seeking to
25  enforce the December 2002 agreement and to enjoin Marland from
26  pursuing the New York arbitration.  Doc ##1, 11.  Thelen maintains
27  that its attorney-client relationship with Marland ended in 2002.
28  Supra.

United States District Court

For the Northern District of California

**B**

Thelen claims that its attorneys on the CDOI case and its executive committee sought and gave legal advice internally in connection with the litigation.  Doc #98 at 2, 6-10.  This included communications with the firm's general counsel, Wynne Carvill.  Id.  According to Thelen, Carvill gathered facts, analyzed legal issues, advised firm management of its legal options and represented the firm in its negotiations with Marland and CDOI, as the parties worked toward new agreements in 2002.  Id.

Carvill was appointed to the bench and left Thelen in November 2003.  Thelen's current general counsel is Robert Blum.  Until Marland commenced the arbitration proceeding against Thelen in February 2006, Blum was Thelen's "only litigation counsel."  Doc #101 at 7.

**C**

Marland sought leave of court on November 21, 2006, December 1, 2006 and December 18, 2006 to bring a discovery motion regarding (1) electronic discovery requests, (2) testimony of Thelen's 30(b)(6) witnesses, and (3) Thelen's privilege log.  Doc ##66, 77, 87.  At the hearing on January 3, 2007, the parties reported that they had resolved the electronic discovery dispute.  The parties also agreed that a motion on Thelen's FRCP 30(b)(6) witnesses was premature.  The court requested additional briefing on the privilege log issues.

The parties submitted simultaneous opening briefs on January 11, 2007.  Doc ##98, 99.  The parties submitted

\\

**7**

simultaneous reply briefs on January 16, 2007.  Doc ##101, 103.
The matter was heard on January 18, 2007.

D

The privilege log identifies 64 documents for which
Thelen asserts attorney-client privilege, work product privilege,
or both.  Doc #93.  The documents contain communications between
and among Carvill, Thelen staff working at the direction of
Carvill, members of Thelen's executive committee, Gary Fontana and
Karl Belgum (the lead attorneys on the CDOI case), and Robert Blum
and Stephen O'Neal (Thelen partners).  Doc #98 at 6-10.

According to Thelen, documents 1-10, 12, 14, 25-31, 33-
34, 50-51, and 57-64 "show Carvill providing information and legal
analysis of various terms under discussion, answering questions
posed by management, analyzing Thelen's legal options in light of
Marland's admitted destruction of key documents, and analyzing the
potential ramifications of not reaching a new agreement."  Id at 7.

According to Thelen, documents 11, 13, 15-19, 20, 24, 35,
38-43, 47-48, and 52-56 "reflect Carvill's efforts to advise
Thelen management regarding the progress of negotiations with CDOI
over the terms of an amendment to the CDOI-Thelen fee agreement and
the potential consequences of failed negotiations."  Id at 8.
These documents "show Carvill providing information and legal
analysis of various terms under discussion, answering questions
posed by management, analyzing the potential specifications of
CDOI's proposals, and of not agreeing to an amendment at all."  Id
at 8-9.

\\

**United States District Court**
For the Northern District of California

8

**United States District Court**
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12

        According to Thelen, document 46 is a memo from Carvill to the executive committee providing advice on a partner's suggestion that the firm withdraw from its representation of RoNo and CDOI.  Id at 9.  Document 9 is an email from the same partner to Carvill asking for Carvill's legal opinion on the February 1999 agreement and the June 1999 fee sharing agreement.  Id.  Document 49 is an email from Blum to Carvill, various firm partners, and the executive committee providing analysis on an Attorney General memorandum that claimed that Thelen had a conflict of interest in representing RoNo and CDOI.  Id.  Documents 21-23 and 36-37 are emails from Belgum to Carvill asking about the agreements Carvill had negotiated in 2002 and 2003.  Id at 10.

13
14
15

        According to Thelen, documents 32, 44, and 45 are emails among Carvill and others at the firm discussing negotiation of the new fee agreement with CDOI.  Doc #93.

16
17
18
19
20
21

        Thelen has not logged certain Blum documents, containing attorney-client communications and attorney work product, created after February 5, 2005, when Marland terminated Thelen.  Doc #101 at 6-7.  In addition to seeking an order compelling production of the 64 logged documents, Marland seeks an order directing Thelen to individually log the Blum documents.  Doc #99 at 8.

22

23

                        **E**

24
25
26

        Just prior to and during the hearing on Thelen's privilege log, the parties raised two additional discovery disputes.

27

\\

28

\\

United States District Court
For the Northern District of California

1

One of these new disputes stems from Thelen's deposition of Marland's European counsel, Philippe Brunswick. Brunswick is a named cross-defendant in this action. On January 12, 2007, Thelen deposed Brunswick in New York City. Doc #104 at 1. According to Thelen, just before the deposition commenced, Brunswick provided Thelen with a letter from the Paris Bar stating that Brunswick would be committing a breach of French secrecy and confidentiality rules should he testify regarding any element or fact relating to his representation of any client. Id at 2. Based on this letter, Brunswick refused to answer any questions about Thelen and the ELIC litigation. Id. Thelen seeks a court order compelling Brunswick's deposition testimony. Id. The parties, including Brunswick's counsel, have submitted letter briefs on this issue. Doc ##104, 107, 113.

2

The other recent discovery dispute involves the inadvertent production of certain documents by Marland's counsel, Andrew Hayes ("Hayes").

Specifically, during the January 2007 Brunswick deposition mentioned above, Thelen's counsel sought to use a document that Marland had produced in October 2006. Doc #106-1 at 1. The document was a letter dated August 27, 2002 from Brunswick to Marland and Francois Chateau (Marland's other European counsel). Id. Hayes claimed that the letter was privileged and inadvertently produced. Id.

Prior to this, there had been three other occasions where Hayes claimed that his office had inadvertently produced one or

10

**United States District Court**
For the Northern District of California

1   more privileged documents.  Id.  Accordingly, following the

2   Brunswick deposition, both sides decided to investigate the

3   discrepancies in the defense production.  Doc #112-1, Exs 17-18.

4   Hayes reports that, following the Brunswick deposition, he

5   discovered for the first time that his copy service had erroneously

6   sent all of Marland's privileged documents to Thelen's counsel,

7   Keker and Van Nest.  Doc #107 at 1.

8           Thelen now seeks an order compelling production of the

9   August 27 Brunswick letter.  Doc #106-1.  Marland seeks sanctions

10  against Thelen including disqualification of Keker for their

11  alleged misconduct in handling the inadvertently produced

12  documents.  Doc #107.  The parties have briefed these issues by

13  letter.  Doc ##106-1, 107, 111-1, 114-1.

14

15                                  II
                    *Thelen's Privilege Log Documents*

16          Federal courts sitting in diversity apply the law of the

17  forum state on attorney-client privilege issues but apply federal

18  common law to attorney work product issues.  <u>Bank of the West v</u>

19  <u>Valley Nat Bank of Arizona</u>, 132 FRD 250, 251 (ND Cal 1990).

20          In California, the attorney-client privilege is codified

21  in Cal Evid Code § 954 and specifies that, subject to certain

22  exceptions, "the client * * * has a privilege to refuse to

23  disclose, and to prevent from disclosing, a confidential

24  communication between client and lawyer if the privilege is claimed

25  by * * * the holder of the privilege * * *."  "Confidential

26  communication is defined as including 'a legal opinion formed and

27  the advice given by the lawyer in the course of that [attorney-

28

United States District Court
For the Northern District of California

client] relationship.' * * * [T]he attorney-client privilege applies to confidential communications within the scope of the attorney-client relationship even if the communication does not relate to pending litigation; the privilege applies not only to communications made in anticipation of litigation, but also to legal advice when no litigation is threatened." Roberts v City of Palmdale, 5 Cal 4th 363, 371 (1993) (internal citations omitted).

"At its core, the work-product doctrine shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case." In re Grand Jury Subpoena, 357 F3d 900, 907 (9th Cir 2004). "[T]he work product doctrine only attaches to documents prepared in anticipation of litigation or for use in trial." Hickman v Taylor, 329 US 495, 511-12 (1947); FRCP 26(b)(3).

A

Assuming that the communications at issue reflect privileged attorney-client communications as defined by California law, the issue is whether the attorney-client privilege applies where a law firm is attorney to both an outside client and to itself. Thelen argues that it does, citing United States v Rowe, 96 F3d 1294 (9th Cir 1996).

In Rowe, a law firm senior partner assigned associates at the firm to investigate the conduct of another of the firm's attorneys in handling client funds. When the government attempted to question the associates in connection with a grand jury investigation, the law firm claimed attorney-client privilege. After the trial court ordered the associates to testify, the court

12

United States District Court
For the Northern District of California

1    of appeals held that the privilege could apply to intra-firm

2    communications.  While Thelen relies on <u>Rowe</u> here, the case

3    involved the assertion of privilege against a third party.  <u>Rowe</u>

4    does not address whether the attorney-client privilege can be

5    asserted against the firm's then-current client.

6         Thelen cites no case in which an intra-firm communication

7    relating to the firm's representation of a client was withheld *from*

8    *the client* under a claim of privilege.  The court finds <u>In re</u>

9    <u>Sunrise Sec Litig</u>, 130 FRD 560 (ED Pa 1989) instructive.

10        <u>In re Sunrise</u> was multidistrict litigation arising out of

11   the collapse of the Sunrise Savings and Loan Association.  One of

12   the defendants was a Philadelphia law firm that had served as

13   Sunrise's general counsel.  An issue before the court was whether

14   the firm had properly withheld from discovery on the ground of the

15   attorney-client privilege a number of documents to and from lawyers

16   in the same firm who had consulted with each other during the time

17   when the firm was general counsel to Sunrise and after the Sunrise

18   litigation against the firm had been instituted.  The court

19   recognized the theoretical existence of an attorney-client

20   privilege between the law firm as attorney and itself as client.

21   The court held, however, that:

22
23        [A] law firm's consultation with in house counsel may
          cause special problems which seldom arise when other
24        businesses or professional organizations consult their in
          house counsel.  A law firm's representation of a client,
25        and its ability to meet its ethical and fiduciary
          obligations to that client, may be affected by its
26        representation of another client, even if the second
          client is the law firm itself.  So, for example, when a
27        law firm seeks legal advice from its in house counsel,
          the law firm's representation of itself (through in house
28   \\   counsel) might be directly adverse to, or materially

                                   13

United States District Court

For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

        limit, the law firm's representation of another client,
        thus creating a prohibited conflict of interest.

Id at 595.  The court ordered in camera inspection of individual documents to determine "if the communication implicates or creates a conflict between the law firm's fiduciary duties to itself and its duties to the client seeking to discover the communications."

        Similarly in <u>Veruslaw Inc v Stoel Rives</u>, 127 Wash App 309, 334 (2005), a legal client sued a law firm for malpractice, and the firm asserted privilege over documents concerning legal and ethical issues in representing the client, created during the representation.  The court held that whether documents relating to advice to one attorney given by other members of the firm were covered by attorney-client privilege required in camera review to determine whether there was a conflict between the firm's own interests and its fiduciary duty to the client.

        Based on these authorities, the court grants Marland's request to order Thelen to produce the documents listed in its privilege log.  The logged documents relate to the Marland representation and were created during the Marland representation. While Thelen states that some of the documents pertain to the CDOI representation, Thelen represented Marland and CDOI for the same purpose; and the interests of Thelen, CDOI and Marland intertwined. As a result, all of these documents implicate or affect Marland's interests, and Thelen's fiduciary relationship with Marland as a client lifts the lid on these communications.  Accordingly, the court orders Thelen to produce all the logged documents other than those that fall within the narrow exception discussed next.

\\

14

The court recognizes that law firms should and do seek advice about the their legal and ethical obligations in connection with representing a client and that firms normally seek this advice from their own lawyers.  Indeed, many firms have in-house ethics advisers for this purpose.  A rule requiring disclosure of all communications relating to a client would dissuade attorneys from referring ethical problems to other lawyers, thereby undermining conformity with ethical obligations.  Such a rule would also make conformity costly by forcing the firm either to retain outside counsel or terminate an existing attorney-client relationship to ensure confidentiality of all communications relating to that client.  This court declines to follow such a strict rule, preferring one that is consistent with a law firm in-house ethical infrastructure.  Accordingly, Thelen is to produce some but not all communications in which a Thelen lawyer seeks or gives advice on the firm's ethical obligations to Marland.

Specifically, while consultation with an in-house ethics adviser is confidential, once the law firm learns that a client may have a claim against the firm or that the firm needs client consent in order to commence or continue another client representation, then the firm should disclose to the client the firm's conclusions with respect to those ethical issues.  See ABA Model Rule of Prof Conduct 1.7.  See also NY Eth Op 789, 2005 WL 3046319 at 4.

In sum, Thelen must produce the documents listed on its privilege log except for certain documents reflecting consultations between Thelen lawyers on the firm's ethical and legal obligations to Marland.  Regarding the consultations, Thelen must produce certain conclusions of those consultations: Thelen must produce any

**United States District Court**
For the Northern District of California

1  communications discussing claims that Marland might have against

2  the firm or discussing known errors in its representation of

3  Marland.   Thelen must produce any communications discussing known

4  conflicts in its representation of Marland or other circumstances

5  that triggered Thelen's duty to advise Marland and obtain Marland's

6  consent.   Conflicts include any representation – whether of Thelen

7  itself, CDOI, or another – adversely implicating or affecting the

8  interests of Marland, when Thelen was receiving information from

9  and/or providing legal advice to its own lawyers while at the same

10 time continuing to represent Marland.

11         Finally, the court notes that, while the logged documents

12 extend through 2003, the parties disagree over when their attorney-

13 client relationship ended.   The court also notes that this issue

14 relates in part to the merits of the case.   Thelen argues that the

15 attorney-client relationship ended "after" August 30, 2002, which

16 the court presumes is September 1, 2002.  Doc #98 at 5.  Marland

17 argues that the relationship lasted until 2005 on the grounds that

18 the 2002 agreement, which purportedly terminated the prior

19 relationship, is invalid and unenforceable.  Doc #102, Ex A.  The

20 court finds that Marland's argument is neither frivolous nor made

21 for an improper purpose.  Accordingly, for purposes of this motion

22 only, and without reaching the merits of the underlying claims, the

23 court orders production of all the logged documents, subject to the

24 limited exception described above.  The court will refer this

25 dispute to a United States Magistrate Judge to review in camera all

26 of Thelen's logged documents and determine which ones should be

27 produced to Marland, based on this directive.

28 \\

B

The court notes that Thelen has asserted two privileges for most of the logged documents: attorney-client and work product. While the above cases only address attorney-client privilege, the court finds the same issues of conflict pertain to the work product protection:

> Like the attorney-client privilege, protection afforded by the work-product doctrine is not absolute. Clearly, lawyers cannot cloak themselves in its mantle when their mental impressions and opinions are directly at issue. The doctrine does not apply where a client, as opposed to some other party, seeks discovery of the lawyer's mental impressions. It cannot shield a lawyer's papers from discovery in a conflict of interest context anymore than can the attorney-client privilege.

Koen Book Distributors, Inc v Powell, Trachtman, Logan, Carrle, Bowman & Lombardo, PC, 212 FRD 283, 286 (ED Pa 2002) (internal citations omitted) (Court ordered production of firm's communications to counsel it retained after client threatened legal malpractice proceedings where firm had continued to represent client). Similarly, the court finds that Thelen's logged documents should be produced here, subject to the above guidelines.

III

*The Blum Documents*

Under FRCP 26(b)(5):

> When a party withholds information otherwise discoverable under these rules by claiming that it is privileged or subject to protection as trial-preparation material, the party shall make the claim expressly and shall describe the nature of the documents, communications, or things not produced or disclosed in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the applicability of the privilege or protection.

17

United States District Court
For the Northern District of California

1  Accordingly, Marland's request to direct Thelen to log Blum
2  documents created between February 4, 2005 and the commencement of
3  the New York arbitration proceeding is GRANTED.  The court also
4  DIRECTS Marland individually to log otherwise responsive documents
5  for which it is claiming privilege for this time period.

6

7

8                              IV
                        *Brunswick Testimony*
9

10          The court lacks jurisdiction to compel Brunswick's
11  testimony at this time.  The deposition subpoena issued from the
12  Southern District of New York, and the deposition occurred in New
13  York City.  Doc #113.  Under FRCP 45(a)(2), a motion to compel
14  concerning a subpoena must be presented to the court for the
15  district in which the deposition would occur.  See Adv Comm note to
16  1991 amendment ("[T]he court in whose name the subpoena issued is
17  responsible for its enforcement.")  Thelen does not dispute that
18  this court is unable to grant the relief it requests.  Accordingly,
19  the court DENIES Thelen's request that it issue an order compelling
20  Brunswick's testimony, although the court does not foreclose
21  reconsideration of the issue at a later time upon procedurally
22  proper request.

23

24                              V

25          *Marland's Inadvertently Produced Documents*

26          Last, the court addresses both parties' requests
27  surrounding Marland's inadvertently produced documents, including
28  the August 27, 2002 Brunswick letter.

                              18

United States District Court
For the Northern District of California

A

*Thelen's Request to Compel Brunswick Letter*

Thelen seeks an order compelling production of the Brunswick letter.  Thelen contends that the Brunswick letter is not privileged because: (1) Marland's delay in asserting the privilege and failure to include the document on his privilege log created a waiver, and (2) the crime-fraud exception to the attorney-client privilege applies.  The court need only address Thelen's first argument to conclude that it is correct.

Thelen states that Marland's counsel never identified Brunswick's letter "on any version of Marland's privilege log: not the log produced on October 3; not the draft revised log produced on October 27, and not the second revised log produced on January 2, 2007." Doc #111-1 at 6.  Marland's counsel does not dispute that he never logged this document and offers no explanation.

As stated above, FRCP 26(b)(5) requires a detailed showing to withhold discovery on privilege grounds.  The law is well settled that failure to produce a privilege log or production of an inadequate privilege log may be deemed waiver of the privilege.  See, e g, <u>Burlington Northern & Santa Fe Ry Co v US Dist Court for Dist of Mont</u>, 408 F3d 1142 (9th Cir 2005) (railroad waived discovery privileges claimed in privilege log it filed in response to request for production of documents in environmental litigation, where railroad filed privilege log five months after the document request, rather than within the 30-day time limit for filing written response to discovery request, was a sophisticated corporate litigant and a repeat player in environmental lawsuits

19

1   and regulatory action involving site that was subject of the suit,

2   and made substantive changes to privilege log after producing it);

3   Universal City Development Partners, Ltd v Ride & Show Engineering,

4   Inc, 230 FRD 688 (MD Fla 2005) (Litigant waived attorney-client

5   privilege for documents it produced where litigant did not provide

6   privilege log or generally describe documents to which it asserted

7   privilege until eight months after written response was due, log

8   failed to identify capacity of many recipients and did not provide

9   sufficient information to assess claim of privilege, litigant's

10  counsel reviewed all 13,000 pages of documents in single evening,

11  and litigant did not review production after it learned that one

12  privileged document had been turned over to opponent to determine

13  whether other privileged documents had been produced.)

14       Weighing all the factors here, the court finds that

15  Marland has waived any privilege for the Brunswick letter.  Marland

16  asserts that *all* of its privileged documents were inadvertently

17  produced, Doc #107 at 1, and that the bates numbers for these

18  documents range from 1 to 533.  Doc #115 ¶4.  Thelen states that

19  only 24 of these documents appear on the privilege log.  Doc #111-1

20  at 2.  Hayes does not dispute that he failed to log the additional

21  documents and gives no explanation.  Moreover, Hayes was put on

22  notice at least three times prior to the Brunswick deposition that

23  he had produced privileged documents and that there were

24  discrepancies between what Keker received and what Hayes intended

25  Keker to receive.  Doc #111-1 at 3-4.  Specifically, Brunswick's

26  deposition was the third consecutive deposition conducted by Thelen

27  in which Hayes asserted that a privileged document was

28  inadvertently produced.  Even prior to that, Keker attorneys had

**United States District Court**
For the Northern District of California

1
2
3
4
5
6
7

notified Hayes that they had found what appeared to be two privileged defense documents.  Id at 3.  Keker contends that it regularly prompted Hayes to send a revised privilege log and that Hayes revised his privilege log twice.  Id at 4, 6.  Yet Hayes never logged the Brunswick letter.  Id at 6.  Hayes does not dispute any of this.  The court therefore finds that Marland failed timely and adequately to make his objections.

8
9
10
11
12
13

The court also notes that, while Hayes reports that he inadvertently produced *all* of Marland's privileged documents, Marland does not move to compel return of those documents.  Doc ##107, 114-1.  Rather, Marland seeks sanctions and mentions no other relief.  Id.  Accordingly, the court finds that Marland has waived any privilege claim over the Brunswick letter.

14
15
16
17

B

*Marland's Requests for Sanctions Including Disqualification of Thelen's Counsel*

18
19
20
21
22
23
24
25

Marland seeks an order imposing sanctions on Thelen including disqualification of Keker for alleged misconduct in Keker's handling of the inadvertently produced documents.  Doc ##107, 114-1.  Marland contends that, based on the scope of Marland's privilege claims regarding communications from Brunswick, Keker knew that Marland had produced many privileged documents and failed to comply with its ethical obligation to promptly notify Marland's counsel and refrain from examining the materials.  Doc #114-1 at 1-2.  The court disagrees.

26
27
28

Marland urges the court to apply ABA Comm on Ethics and Prof Responsibility, Formal Op 92-368, which states:

**United States District Court**
For the Northern District of California

> A lawyer who receives materials that on their face appear to be subject to the attorney-client privilege or otherwise confidential, under circumstances where it is clear they were not intended for the receiving lawyer, should refrain from examining the materials, notify the sending lawyer and abide the instructions of the lawyer who sent them.

Doc #107.

Thelen points out that this opinion was withdrawn by the ABA in 2005 and replaced with ABA Formal Ethics Opinion 05-437, which states:

> A lawyer who receives a document from opposing parties or their lawyers and knows or reasonably should know that the document was inadvertently sent should promptly notify the sender in order to permit the sender to take protective measures. To the extent that Formal Opinion 92-368 opined otherwise, it is hereby withdrawn.

Doc #111-1.

Under either authority, the first question is whether the receiving lawyer had reason to know that the documents were subject to a claimed privilege.  Marland's only argument is that Keker knew Marland was asserting privilege over communications from Marland's European counsel, including Brunswick, that were not shared with Thelen.  Doc #114-1 at 1-2, 5-6.  The court finds that blanket and general objections do not provide sufficient detail about the documents in this case in order to trigger the obligations under the foregoing ethical rule.  This is why FRCP 26(b)(5) requires a detailed showing to withhold discovery on privilege grounds.  See Universal City Development Partners, Ltd v Ride & Show Engineering, Inc, 230 FRD 688 (MD Fla 2005).  Indeed here, Thelen points out that Marland had produced nearly 800 pages of communications between and among Brunswick, Marland, and Chateau.  Doc #112-1 at 8.

**United States District Court**
For the Northern District of California

1   Even as to the 24 inadvertently produced documents that
2   Marland *did* log, the court cannot find an ethical violation.
3   Marland did not provide bates numbers on its log.  Id at 7.
4   Marland cites no authority, and the court knows of none, requiring
5   a receiving party to cross-check documents produced against the
6   producing party's privilege log.  Nonetheless, where Keker became
7   aware of logged documents that had been produced, it notified Hayes
8   immediately.  Id at 2.  Following the Chateau deposition, the
9   second consecutive deposition where Hayes asserted that a
10  privileged document was inadvertently produced, Keker emailed Hayes
11  stating: "You have indicated at various times that your office
12  inadvertently produced one or more privileged documents from Mr
13  Marland.  In order to be sure we are understand [sic] fully the
14  documents you believe are privileged and were inadvertently
15  produced, please provide us promptly with a list of these
16  documents, and a revised privilege log."  Doc #112-1 Ex 13.  Hayes
17  responded: "I am not aware of any other inadvertently-produced
18  documents."  Id.

19  Finally, following the Brunswick deposition, Keker *did*
20  undertake its own investigation into the discrepancies by cross-
21  checking Marland's production against the log and then promptly
22  notifying Hayes that it had found 24 logged documents in the
23  production.  Doc #112-1 at 8-9.  Because the log did not include
24  bates numbers, Keker associates and staff were forced to cross-
25  check the documents using the date, author, recipient, and
26  description information on the log, taking several days.  Id.
27  \\
28  \\

23

1       Marland does not dispute this.  "We note that whenever a

2  lawyer seeks to hold another lawyer accountable for misuse of

3  inadvertently received confidential materials, the burden must rest

4  on the complaining lawyer to persuasively demonstrate inadvertence.

5  Otherwise, a lawyer might attempt to gain an advantage over his or

6  her opponent by intentionally sending confidential material and

7  then bringing a motion to disqualify the receiving lawyer." State

8  Compensation Ins Fund v WPS, Inc, 70 Cal App 4th 644, 657 (1999).

9  Accordingly, the court does not find an ethical violation in Thelen

10 or Keker's handling of the documents and DENIES Marland's request

11 for sanctions.

12

13                              VI

14      For the reasons discussed above, the court will refer

15 this matter to Chief United States Magistrate Judge Larson for

16 random assignment to a United States Magistrate Judge.  Thelen

17 shall within two days of entry of this order submit all of its

18 logged documents under seal to the assigned magistrate judge, who

19 is directed to review the documents in camera as soon as

20 practicable.  The assigned magistrate judge shall determine which,

21 if any, of the documents can be withheld based on the limited

22 exception described above.  The court ORDERS Thelen to produce to

23 Marland all documents falling outside of the exception as

24 determined by the magistrate judge.  Such production shall be made

25 within two days of the magistrate judge's determination.

26      Additionally, as discussed above, the court DIRECTS both

27 Marland and Thelen to revise their privilege logs to include

28 documents created between February 4, 2005 and the commencement of

                              24

United States District Court
For the Northern District of California

1  the New York arbitration.  The court DENIES without prejudice

2  Thelen's request for an order compelling Brunswick's deposition

3  testimony.  The court GRANTS Thelen's request to compel production

4  of the August 27, 2002 Brunswick letter and ORDERS Marland to

5  produce that letter.  The court DENIES Marland's request for

6  sanctions including disqualification of Thelen's counsel.

7          The court has received Thelen's letter of February 20,

8  2007, Doc #128, requesting a conference regarding a dispute over

9  the continuation of Marland's deposition.  The parties are to

10  appear for a conference on February 23, 2007 at 9:00 am.

11

12          SO ORDERED.

13  _____

14  VAUGHN R WALKER
   United States District Chief Judge

25